IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| ANTHONY FERRARA | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 2:15-CV-00182 |
| | § | JURY DEMANDED |
| | § | |
| 4JLJ, LLC d/b/a J4 OILFIELD SERVICES | § | |

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S FIRST AMENDED BENCH BRIEF ON THE ADMISSIBILITY OF HUMBERTO MORALES'S DEPOSITION TRANSCRIPT

NOW COMES Plaintiff Anthony Ferrara (hereinafter "Plaintiff") and files this his Brief in Opposition to Defendant's First Amended Bench Brief on the Admissibility of Humberto Morales's Deposition Transcript, and respectfully states as follows:

### I. STATEMENT OF FACTS

**Ferrara Case**

This suit was filed on April 2, 2015, and as the Court is aware, is an FLSA mis-classification case filed by a single employee, claiming that although he was given the title of a supervisor, and paid a salary, he had no supervisory duties. **At the heart of the case is the issue of whether Plaintiff, who held the position of a "treater" (an oilfield job position), performed exempt duties pursuant to the FLSA.** A Scheduling Order was entered by this Court on June 29, 2015. The Scheduling Order set the discovery deadline at December 1, 2015, and ordered that trial occur on April 18, 2016. **At the time that the discovery deadline expired on December 1, 2015, Defendant had only taken the deposition of Anthony Ferrara.** On March 7, 2016, just weeks prior to trial, Defense counsel requested a continuance due to Allison Moore leaving the Branscomb

firm. The trial was then reset by the court to May 16, 2016. On May 5, 2016, the day before the pretrial conference, Mr. Pipitone in ex parte communications with the Court, canceled the pretrial hearing (claiming a medical emergency), and requested a continuance of the trial. Plaintiff's counsel agreed to the continuance based on Mr. Pipitone's representations.

### Edwards Case

In speaking with witnesses regarding the Ferrara case, Plaintiff's counsel learned that Defendant had paid its hourly employees based on jobs performed, and did not keep records of actual hours worked. With regards to its employees that worked in the pump division, Defendant paid its employees based on ticket hours. Accordingly, if a customer was charged 10 hours for the use of a pump, the employee received 10 hours of pay, regardless if the employee worked 2 hours or 20 hours. With regards to the frac division, employees were paid 18 hours for completing one stage in a day, and 24 hours if they completed two stages (the number of hours eventually changed as time progressed). It did not matter whether the employees worked 5 hours, 10 hours or 24 hours, they were paid the same amount of "hours."

After several months of consideration, Joshua Edwards, who had worked both in the frac and pump divisions, decided that he wished to file suit against Defendant for violations of the FLSA. Plaintiff's counsel sent an email to Defense counsel in the present case, informing him of Edward's intent to join the Ferrara case. Defense counsel objected, stating that the cases were completely different, and therefore should be separate suits. **[Ex. "A"]** After reviewing the matter, Plaintiff's counsel agreed with Defense counsels analysis, and filed a separate collective action suit on July 13, 2015. Plaintiffs have sued not only Defendant 4JLJ, LLC, but also the sole owner of 4JLJ, LLC, John Jalufka. At no point has Defendant attempted to consolidate the cases.

The only exemption Defendants are claiming in the Edwards case is the Motor Carrier Act exemption.

### Edwards Depositions Taken by Plaintiffs

On May 6, 2016, Plaintiff's counsel took the deposition of Travis Irelan. During the deposition, Mr. Irelan often referred to Anthony Ferrara, however, when Plaintiff's counsel asked who Anthony Ferrara was, counsel for Defendant instructed Mr. Irelan to not respond and informed Plaintiff's counsel that the deposition was an Edwards case deposition, and not a Ferrara deposition, and requested that Plaintiff's counsel not ask any questions that would touch upon the Ferrara case. **[Ex. "B" pgs. 105-109]** Plaintiff's counsel honored the request.

### Edwards Depositions Taken by Defendants

During the week of June 17, 2016, seven months after the discovery cut-off in the Ferrara case, Defendants took the depositions of 9 opt-in plaintiffs in the Edwards case. From the very first deposition, it became very obvious that the Defendants were using the Edwards depositions as a vehicle to elicit testimony regarding the Ferrara suit, long after the discovery deadline, despite repeated objections and requests by Plaintiffs' counsel that the depositions be limited to the Edwards case. During the Juan Mares deposition, the following questioning occurred:

> Q     Okay. You had treaters that would only treat, but they weren't supervisors?
>
> A     Exactly. You had a supervisor in during the data van with them, but that didn't mean that because the guy was treating was a supervisor.
>
> Q     Okay. Who were the treaters for CJ that you can recall?
>
> A     For C&J?
>
> Q     Uh-huh.

A      For C&J, well, like I said, it was Gavino Hernandez, J.T. Navah, Ernesto Flores. A couple more guys.

Q      All right. Who were the treaters for J4?

A      That I saw treating, which were only treaters was -- Ernesto Flores used to treat. Israel Banda, Travis -- I don't recall his last name -- and Anthony.

Q      You don't recall Travis' last name?

A      Irelan, I believe.

Q      Okay. And do you recall Anthony's last name?

A      I don't recall his last name.

Q      Ferrara sound familiar?

A      Ferrara, yeah. Something like that.

Q      All right. Again, I apologize for the reference. But Mr. Gutierrez, he testified that there were treaters and there were treaters in training. And that treaters in training -- I think it -- to some -- to -- to your point didn't have as big of a -- a supervision role, but the treaters -- once they became an actual treater -- they were head of that crew, they ran that crew, they directed their work.
     MR. MOULTON: Objection. Go ahead. Sorry.

Q      Is that also your experience?
     MR. MOULTON: Objection, mischaracterizes his testimony.

A      No.

Q      Tell me how that diff -- that's different from your experience.

A      What I saw. What my eyes saw, basically.

Q      Okay. Well, tell me what you saw.

A      You can't call somebody a supervisor when he can't be able to take decisions on his own.

Q      Okay.

A       And, like I said, to me -- to my point of view, a treater is one and a supervisor is another one.

Q       Okay.

A       Cause basically a supervisor could come to me and tell me "you're fired," but a treater can't do that.

Q       Okay. So, other than telling you that you're fired, what -- what makes the difference between a supervisor and a treater?

A       Basically authority you had there.

Q       Okay. And other than the ability to fire in your mind, what's the difference in authority between supervisor and treater?

A       Take decisions. Take your own decisions without having to go to three other people or four to make a decision.

Q       So, is it your opinion in order to be a supervisor, you have to be the very top of the company?

A       I mean, like you said, it could be my opinion.

Q       Uh-huh.

A       But I've always seen it like if I'm going to be a supervisor, I got the authority to do movements around, cause I'm in charge, and not ask for -- in a simple way, ask permission to another guy to ask to see if we could do that.

Q       Okay. So in your opinion -- opinion, in order to be a supervisor, you have to be able to make unilateral decisions and you can't ask for anyone else's permission to do anything; is that correct?

A       I mean, the permission, you could ask for it. But, I mean, as long as you take the initiative into doing what you think is right, or what you think you have to do to run your show -- cause basically to me a supervisor, he's the one in charge of the show right there.

Q       Okay. Who are the supervisors that were out on site?

A       What company are we talking about?

Q   J4.

A   Supervisors out on site? We had Travis Irelan and Israel Banda. I mean, I can't -- I can't call Anthony a supervisor cause, yes, he did know stuff -- yes, he did -- but he didn't have all the power to be a supervisor.

Q   And, again, Mr. Gutierrez testified that Mr. Ferrara didn't have any -- there was no differences in his authority or his ability to run the crew. Was he lying? Was he -- I mean, I'm trying to figure out why there's such a difference in the testimony?
MR. MOULTON: Objection, misstates the record.

Q   You can answer.
Mr. MOULTON: Assumes evidence not --assumes --
MR. HARVEY: Facts not in evidence?
MR. MOULTON: Facts that are not in evidence.

Q   You can answer.

A   Basically that's his saying. I mean, we're all going to have a different say.

Q   Okay.

A   That's the way I see it.

Q   Okay. So, that's just your personal opinion?

A   Exactly.

Q   And Mr. Gutierrez may have a different personal opinion?

A   Exactly. We could -- I think everybody in this world has a different point of view.

Q   Okay. How did the -- the treaters -- how did they interact with the -- the rest of the crew?

A   Well, some of them did pretty good. I mean, while we were out there, we all try to be good to each other. We all try to be a good family.

Q   Uh-huh.

A   Sometimes it worked; sometimes it did not.

Q   When you were actually on a site -- now, you said the treater is in a data van?

A    A data van, correct.

Q    How does he communicate with everybody else?

A    Through radios.

Q    Okay. And a treater would radio the blender and tell them, "Hey, this is what needs to be done. This is what I need," correct?

A    Correct.

> MR. MOULTON: Harvey, this is an Anthony Ferrara deposition or an Edwards deposition? When we --when we got a little bit into Anthony Ferrara on your witnesses, you guys shut it down really quick.
> MR. HARVEY: I -- I don't know if I've asked a direct question about Ferrara. I think he was the one that offered up the -- the Ferrara.
> MR. MOULTON: You know what you're doing.
> MR. HARVEY: Well, clearly we've prepped him on it, so --
> MR. MOULTON: Well, I'm going to object to these questions.
> MR. HARVEY: Okay. You're free to object.
> MR. MOULTON: And at some point, we'll -- we'll just shut them down and call the judge.
> MR. HARVEY: All right. Let me know when.
> MR. MOULTON: We can do it now.
> MR. HARVEY: All right.
> VIDEOGRAPHER: You want to go off the record?
> MR. MOULTON: Yeah.
> VIDEOGRAPHER: All right. It's 3:36. We're off the record.

**[Ex. "C" pgs. 17-23]**

As is readily evident, the questioning had absolutely no relevance to the Edwards case, but was directly geared towards eliciting testimony highly relevant to the ultimate issues presented in the Ferrara case. As a result of such blatant Ferrara case questions taking place in an Edwards deposition, seven months after the discovery deadline in the Ferrara case, Plaintiffs' counsel attempted to obtain a ruling that would prevent such questioning outside of the Ferrara discovery deadline. However, in a telephone hearing with Magistrate Judge B. Janice Ellington, Mr. Harvey

represented to the Court that Plaintiffs were overreacting and that Mr. Ferrara's name had not even been mentioned in the deposition. Mr. Harvey further represented to the Court that he was merely getting background information from the deponent. After learning that the Ferrara case was a mis-classification case for a single employee, while the Edwards case was a collective action based on the improper usage of task based pay, Judge Ellington made the comment that there was no harm since the depositions in the Edwards case could not be used in the Ferrara case. Accordingly, Judge Ellington ordered that the depositions not be limited at that time. **[Ex. "D"]**

Apparently emboldened by Judge Ellington's ruling, the Edwards depositions became progressively Anthony Ferrara centered, and by the time that the last deposition was taken, Defense counsel was going line-by-line through declarations that had been filed solely in the Anthony Ferrara case. **[Ex. "F" pgs. 125-152]**

## II. ARGUMENT AND AUTHORITY

As Defendant points out, prior testimony is considered inadmissible hearsay, unless the testimony:

(A) was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and

(B) is now offered against a party who had - or, in a civil case, whose predecessor in interest had - an opportunity and similar motive to develop it by direct, cross-, or redirect examination.

Defendants are attempting to offer the testimony of Humberto Morales against Anthony Ferrara. Anthony Ferrara is not a party to the Edwards case. Anthony Ferrara has no interest in the outcome of the Edwards collective action case. The outcome of the Edwards case would have no precedential value as to the Ferrara case, and likewise, the outcome of the Ferrara case would have

no precedential value as to the Edwards case. Mr. Ferrara did not attend the Edwards depositions, and had no reason to do so. Since the testimony was given in an Edwards case deposition, and since such testimony had absolutely no relevance or bearing on the outcome of the Edwards case, there was no motive or reason to develop such testimony by direct, cross-, or redirect examination. Accordingly, there was no "similar motive," and therefore such testimony is hearsay in the Ferrara case.

Had Defendant not sought a continuance, the Edwards depositions would have taken place long after the Ferrara case had been tried. Instead, Defendant took full advantage of a claimed medical emergency and the good will of Plaintiff's counsel, and took depositions in the Edwards case that were clearly designed to obtain discovery in the Ferrara case seven months after the discovery deadline. Defendant should not now be allowed by this Court to use such ill gotten gains. Further, to allow admission of Edwards depositions in the Ferrara case would be in contravention of Judge Ellington's statements made during the discovery hearing.

### III. CONCLUSION

In view of the facts and arguments set forth above, Plaintiff requests the Court to consider Plaintiff's Brief and find that the deposition of Humberto Morales is inadmissible hearsay.

**DATED** this 15th day of September, 2016.

Respectfully submitted,

James Moulton
State Bar No. 24007712
Moulton & Price, P.C.
109 SH 110 South
Whitehouse, Texas 75791
Ph:   903-871-3163
Fax: 903-705-6860
jim@moultonprice.com

*ATTORNEY FOR PLAINTIFF*

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing is being served on counsel for Defendant on the 15th day of September, 2016.

James Moulton